# SOUTHERN HOUSING CO. v. MORTON.—242 S. W. (2d) 843.

Western Section. July 13, 1950.

Petition for Certiorari denied by Supreme Court, December 9, 1950.

Herbert Gannaway, Armstrong, McCadden, Allen, Braden & Goodman, all of Memphis, for complainant.

Burch, Porter & Johnson, of Memphis, for defendant.

ANDERSON, P. J. Complainant, a corporation, paid the defendant $31,350 in purported settlement of an indebtedness. It claims that in so doing, it, by mistake, paid him $17,000 too much, and prays a recovery for that amount and for general relief. Defendant demurred to the bill on the ground that it affirmatively showed an accord and satisfaction after the alleged overpayment and also showed that subsequent to said payment, an account was stated and settled between the parties and this being true, the account could not be re-opened except upon proper averments and the proper prayer. An additional ground was that the bill failed to charge that the alleged mistake under which the payment was made was a mutual one.

The demurrer was overruled without prejudice to the defendant's right to rely in his answer upon his claim of a stated account. Thereupon the defendant filed separate pleas of an account stated and settled and of accord and satisfaction. He also filed an answer raising the same defenses and a cross-bill in which he avers that in the event the complainant was unwilling to abide by the settled account or the accord and satisfaction set forth in the pleas and answer, and was desirous of setting the same aside and re-opening the account, or surcharging, or falsifying it, the defendant should be permitted to show that the complainant was still indebted to him and he prays for a recovery against the complainant in such amount as would be shown due him upon a proper accounting.

By answer, the complainant denies the material allegations of the cross-bill and avers that in arriving at a balance of $31,350.81 due by complainant to defendant,

the auditors of the respective parties had failed to take into consideration the sum of $17,000 which the complainant had paid for the defendant's account and that without knowing this fact at the time, the complainant had paid to the defendant said balance and hence the mistake, as alleged in the original bill.

At the conclusion of all the evidence the defendant moved that the chancellor withdraw the issues from the jury and dismiss the bill on the ground that the undisputed evidence showed the parties had either entered into a stated account or a final settlement which must be first set aside before the rights under the contracts could be re-examined. The motion was overruled and the chancellor then submitted to the jury one issue in the following language: "Did Southern Housing Company under a mistake of fact pay Herbert W. Morton $17,000.00 more than the parties had agreed Morton was due?" The jury answered in the affirmative. The defendant then moved for a new trial and for a decree notwithstanding the verdict of the jury and the plaintiff moved for a decree on the verdict. All of the motions were overruled and the cause was referred to the clerk and master with the direction that he state an account between the complainant and defendant as of January 4, 1949, showing what balance was due and owing by the complainant to the defendant, or by the defendant to the complainant under the contracts entered into between the parties and filed as exhibits A and B to the answer and cross-bill of the defendant, said accounting to reflect the indebtedness existing as of January 4, 1949 immediately prior to the payment by the complainant to the defendant and cross-complainant of the sum of $31,350.81 made by check on that date.

When the pleadings, the evidence and the relief granted are considered, the record reflects a rather anomalous situation. To present it clearly requires a rather detailed examination.

Complainant is engaged in the business of developing residential subdivisions of real estate. The defendant is a contractor engaged in the business of constructing residences. In the fall of 1947, it entered into two contracts with the defendant whereby it engaged him to supervise the construction of a number of residences on lots owned by it, which when completed were to be sold. The second contract was in reality an amendment of the first. All told, some 343 houses were constructed under the arrangement. Under the amended contract, the defendant for his services in connection with the construction of 75 of the houses, hereafter referred to as the first group, was to receive $237.50 per house. For the remaining houses, referred to hereafter as the second group, he was to receive one-third of the net profits, the complainant one-third, and the remaining one-third was to go to Garrett and Stephens who, by the amendment to the original contract, had been brought into the enterprise as sales agents entrusted with the sale of the houses. As amended, the contract provided that the net profit on the second group should be the difference between the total sale price of each house and certain particularly specified items of expense or cost.

Some time prior to December, 1948, all of the houses had been completed and sold or contracted to be sold, and as a result, the complainant was indebted to the defendant in a substantial amount after receiving credit for payments that had been made to him or for his account during the progress of the work.

In September, 1948, Miller, a public accountant, had made an examination of the complainant's books to determine the cost or expense chargeable to the project, calculated according to the terms of the written contract between the parties. Later, two other public accountants, Stewart and Bass, who were connected with the accounting firm of Homer K. Jones, also made an audit of the complainant's books designed to show the status of the entire enterprise, including the profits that had been realized. In making their audit, it seems that Stephens and Bass did not follow the terms of the contract relative to the cost and expense chargeable to the project, with the result that there was a substantial difference between them and Miller with respect to the profits which had been made.

For some time prior to December, 1948, the defendant had been demanding a settlement on the basis of the contract and payment of the amount due him; but his efforts had not been successful, due to inability of the parties to agree on the amount of profits. There was no controversy about the amount to which the defendant was entitled for his services in connection with the first group of houses for which he was to be paid $237.50 per unit. The disagreement was with respect to the profits which had been made on the second group of houses, and it arose from the fact that in calculating the profits, the complainant pursuant to the audit of Stewart and Bass had charged as a part of the cost certain items which the defendant insisted were not contemplated by the contract as amended. Finally, a conference of all concerned was arranged for the night of December 31, 1948. The purpose was to try to settle these differences in order that the profits made on the second group of houses could be ascertained and utilized in determining the

amount due the defendant by the complainant, and also the amount due Garrett and Stephens. At this conference, the complainant was represented by George Florida and one Grandorff. Although it does not expressly appear, it is inferable that these two were executive officers and directors of the corporation and that together with George Florida's brother, Andrew, were the real owners. The complainant also had present the two public accountants Stewart and Bass who had made the last audit of the complainant's books. Stephens and Garrett were present, as were the defendant and Miller, the public accountant, who as said had in the previous September made a calculation according to the terms of the written contract between the parties of the cost or expense of the second group of houses.

In the course of the work the defendant had become indebted to the firm of Price & Curd, and to secure this indebtedness he executed in September, 1948, an assignment of funds due him by the complainant. The latter accepted notice of the assignment and pursuant thereto on the morning of December 31, 1948, paid or caused to be paid to Price & Curd, $17,000 in satisfaction of the indebtedness secured by the assignment. Upon this payment being made, George Florida, who seems to have been the complainant's principal representative throughout, notified the defendant of the fact. It was on the night of that day that the aforesaid conference between the interested parties was held.

All those present at the conference agree that throughout the negotiations the defendant insisted that in arriving at the net profits of the second group of houses, the complainant had charged against it several large items of cost or expense not contemplated by the contract thereby reducing the profits by a very substantial amount.

The evidence on behalf of the complainant is to the effect that after considerable discussion, a tentative agreement was reached that certain items of expense charged to the enterprise by the complainant in its calculation should be eliminated in determining the profits of the aforesaid second group of houses, and that thereupon the three accountants present were instructed to ignore the contract and prepare a statement calculating the expense or cost on the basis of said agreement. There is a conflict in the evidence as to whether the parties were to meet again. Complainant's representative, Florida, says they were not. Defendant says they were, that the meeting was to be at complainant's office and that he appeared at the appointed time and place on the following Monday, January 3d, but no representative of the complainant showed up.

In any event, in a day or two following the aforesaid conference of the night of December 31st, the three auditors collaborated in the preparation of a statement showing the profits made on the second group of houses calculated not according to the terms of the contract, but on the basis of the tentative agreement reached at the conference on the night of December 31st, with respect to the items of cost or expense which were to be charged to the enterprise.

This statement showed the defendant's share of the profits on the second group of houses to be $45,613.99. As said, the defendant claims that the parties were to meet again on Monday, January 3d, to pass on the statement which the accountants were to prepare, but that no one else showed up, notwithstanding that he stayed around the complainant's office all day. He returned on the following day, determined to get a check for the balance due him. It seems that George Florida, who as

stated, was the complainant's principal representative in the entire matter, had gone to Arkansas following the meeting of the night of December 31st. When defendant reached the complainant's Memphis office on January 4th, and found Florida was again absent, he located him by phone in the complainant's office in Osceola, Arkansas, and demanded that he be paid the amount due him. Florida told the defendant to put the complainant's bookkeeper on the phone. This was done, and Florida told the bookkeeper to ascertain from Stewart the auditor, how much the defendant was due and to give him a check for it. So far as appears, Florida had never seen the statement prepared by the auditors. Upon consulting Stewart, the bookkeeper was told by him that the defendant was due $31,350. The bookkeeper thereupon gave the defendant a check for that amount. In arriving at this balance due defendant, Stewart had made his calculation on the basis of the statement which had been prepared by him in collaboration with the other auditors showing the profits which had been made on the second group of houses, plus the $17,812.50, which defendant had earned in connection with the construction of the first group of houses, for which he was to be paid on the basis of a specified price per unit, and certain other credits, together with the debits to the defendant's account as reflected by the complainant's ledger. However, it seems that the $17,000 which complainant had paid for the defendant's account on the morning of December 31st to Price & Curd had not been posted on the ledger when Stewart made his calculation, and hence it was not taken into account by him in arriving at the aforesaid balance for which the defendant was given the check.

After the delivery of the check to the defendant on January 4, 1949, the matter rested until March, 1949, when

the complainant advised the defendant that he had been overpaid in the sum of $17,000. This the defendant vigorously denied and said that while, rather than incur any longer delay in getting his money he had accepted the payment in full satisfaction of the amount due him, as a matter of fact he had not received all he was entitled to by some three or four thousand dollars. When the complainant persisted in its insistence of an overpayment, the defendant offered to re-negotiate a settlement from the beginning, making a bond for the overpayment of the $17,000. This offer the complainant declined, and instead instituted this suit.

By an appropriate assignment of error the complainant contends that having approved the verdict of the jury the chancellor had no choice but to enter a decree in its favor for restitution of the sum of $17,000 plus interest which it is insisted, the jury found to have been paid by complainant to defendant under a mistake of fact in excess of the amount the parties had agreed upon as due the defendant. It is said, ''The answer of the jury to the single issue presented, approved by the chancellor, determined the issue in the case and inexorably formed the predicate for the decree of restitution to which complainant was thereupon entitled.''

The legal basis for this contention has been stated by the American Law Institute as follows: ''A person who has paid another an excessive amount of money because of an erroneous belief induced by a mistake of fact that the sum paid was necessary for the discharge of a duty, for the performance of a condition, or for the acceptance of an offer, is entitled to restitution of the excess''. Restatement of the Law, Restitution, Sec. 20.

Cases in this State in accord with this statement of the rule are, Guild v. Baldridge, 32 Tenn. 295; W. E. Rich-

mond & Co. v. Security National Bank, 16 Tenn. App. 414, 64 S. W. (2d) 863; see also, Williston on Contracts, (Rev. Ed.), Vol. 5, Sec. 1574.

The complainant's contention is based upon the assumption that the affirmative answer of the jury to the issue submitted to them constituted a double finding: (1) that the parties had agreed on the amount due from complainant to defendant; and (2) that the complainant overpaid the defendant by $17,000 under a mistake of fact.

■ It is true that the Chancellor did refuse to set the verdict aside and overruled a motion for a new trial by the defendant, and it is also true that the decree expressly recites that he approved the verdict; but his action in declining to award a decree and, instead, ordering a reference to stage a general account as well as the remarks he made in the course of his overruling of the several motions of the parties, are all proper matters to be considered in determining whether there was such an approval of the verdict as is contemplated by the rule that a verdict will not be disturbed on appeal when supported by any material evidence. Davis v. Mitchell, 27 Tenn. App. 182, 204, et seq., 178 S. W. (2d) 889 and cases cited.

■■ When these factors are considered, it is clear that the Chancellor did not approve the verdict, or rather that he did not approve the interpretation of the verdict which the complainant's sole contention postulates. Upon the contrary, he took the view that the payment was intended by both parties to be a final settlement of the indebtedness and he interpreted the verdict to mean that this settlement was due to a unilateral mistake of fact resulting in the complainant's paying the defendant $17,000 more than he intended to pay, and that the verdict

therefore authorized a rescission of the settlement between the parties which would restore the status quo. There was abundant evidence in the record to sustain this view, and there can be no question about the jurisdiction of the chancery court in a proper case to rescind such a settlement for a unilateral mistake. Whether the Chancellor's interpretation of the verdict was the correct one we need not decide, because there is, we think, no substantial evidence to sustain the view of it, which forms the basis of complainant's sole contention in this court. In this situation the Chancellor was authorized to decide the case upon the record at large under the practice established by Mutual Life Ins. Co. of New York v. Burton, 167 Tenn. 606, 72 S. W. (2d) 778; see also Carpenter v. Wright, 158 Tenn. 289, 13 S. W. (2d) 511.

Before dealing with the question of whether the Chancellor's action was justified by the pleadings, we will examine the evidence to demonstrate that the complainant's interpretation of the verdict is without substantial support therein.

It is of decisive importance to note that when translated into figures, the complainant's contention necessarily is that the jury found that the parties had agreed that the amount due from the complainant to the defendant was $14,350.81, instead of the $31,350.81 which he was paid. There is no substantial evidence to support the conclusion that there was any such agreement. Upon the contrary, all the evidence shows that if there was any agreement at all about this feature of the matter, it was to the effect that the balance due the defendant was $31,350.81. Moreover this view is fully supported by the specific averments of the bill wherein it is charged that at the time said $17,000 payment was made "the complainant and the defendant and their respective auditors

agreed that there was a balance of $31,350.81 due defendant by complainant".

Apparently the complainant's contention now is that at the conference of December 31st there was an agreement not on the amount due the defendant but on a basis for ascertaining the profits on the second group of houses which, when ascertained on said basis and utilized as one item in stating the account would result in a balance due the defendant of $14,350.81 instead of the $31,350.81 which he was paid. But this was not the issue submitted to the jury with respect to the nature of the agreement, nor is it what is charged in the bill.

Moreover, there is no substantial evidence to support the view that there was any final agreement on the basis for ascertaining the profits on the second group of houses in the sense that the parties were to be bound by the result reached by the auditors.

Prior to going to the conference of December 31st, the defendant had obtained from the auditor Miller, data from which he had calculated for himself not only the profits on the second group of houses and his share, but the balance due him from the complainant after giving the latter credit for all payments on account, including the $17,000 payment which Florida, complainant's representative, notified him had been made that day. On this basis he calculated that he was due approximately $31,000 and the evidence is to the effect that he went to the meeting demanding that amount. When during the conference the complainant's representative expressed a willingness to eliminate some of the items of the cost which it had charged to the enterprise and to which the defendant was objecting, defendant agreed that a new statement should be prepared by the auditors with a view of ascertaining what the exact amount of the profits

would be with those items eliminated. But the defendant did not agree that he would be bound by the result of the calculation. Upon the contrary, before determining that matter, he manifestly wanted to see how near the result would come to the figure at which he himself had arrived and used in determining the balance that was due him. As already said, the statement was not made by the auditors until two or three days later and the evidence is to the effect that when the conference of December 31st broke up, the defendant was still demanding $31,000 as the amount due him and that he stated that the complainant could put in or take out any items of expense it wanted to, but that he was due that sum and unless he got it, he was going to file suit the next day. In short, the defendant's position was that it was immaterial to him what particular items of expense were charged to the enterprise in the statement to be prepared by the auditors; that if the result was such that when his share of the profits as thus ascertained was utilized in stating his account, showed the complainant due him $31,000, he would accept it; otherwise, he would not.

As said, in his calculation of the amount due him, the defendant had allowed the complainant credit for the $17,000 payment, and when he learned that the statement of his account made by Stewart showed him to be due $31,350.81, a little more than he himself had figured, he accepted it in full satisfaction of what he was due. There is no evidence that he was aware of the fact that in stating his account the auditor, Stewart, had omitted to charge him with the $17,000 payment.

Moreover, the evidence on behalf of the complainant shows that there was no final agreement reached at the conference of December 31st in the sense that all the parties were to be bound by the statement of the profits

which the auditors were to prepare. Thus, the complainant's auditor Stewart says that "there was a tentative settlement", at the conference of December 31st, "which Mr. Florida O. K.'d by telephone." He was manifestly referring to the telephone conversation in which Florida instructed complainant's bookkeeper to consult Stewart and pay the defendant whatever amount Stewart said was due him. Elsewhere Stewart testified that when the conference of December 31st broke up, the parties had reached no agreement, that the agreement was to be found in Florida's telephone instructions to the complainant's bookkeeper and the defendant's acceptance of the check issued pursuant thereto.

Bass, the other auditor whom complainant had present at the meeting of December 31st, testified for complainant that at that conference the auditors were instructed to prepare a statement of the profits of the second group of houses, leaving out certain items of expense which the complainant had charged to the enterprise, and present the statement to the parties in interest "for a final approval".

The testimony of the complainant's representative Florida as to whether after the December 31st meeting there was another at which all of the parties were present, is confusing and contradictory. He first said that there was a meeting on the following day, at which the statement of the profits prepared by the auditors was presented and approved, but a consideration of his testimony as a whole makes it clear that he was wrong about this and he is so shown to be by the other evidence introduced in complainant's behalf. The preparation of the statement was not finished until January 3d, and it is dated January 4th. As above stated, complainant's auditor Stewart testified that no final agreement was

reached at the meeting of December 31st, and that the statement which the auditors were directed to prepare was not finished until the following Monday.

After the aforesaid statement of the profits of the enterprise had been prepared by the auditors, Stewart, complainant's auditor, undertook to prepare a statement of the defendant's account with the complainant, utilizing the figure arrived at in the other statement to determine the defendant's share of the profits, and also the other debits and credits to the account with the exception of the $17,000 made to Price & Curd, which was omitted. This is the statement showing a balance in the defendant's favor of $31,350.81, and is filed as an exhibit to the bill. Just when it was prepared does not clearly appear; nor is it clear whether the defendant ever saw this statement; probably not. But in any event the auditor Miller apparently saw it or learned of the balance which the statement showed due the defendant and communicated that information to him, and as already said since it was a little more than what he himself had calculated he was due, the defendant settled on that basis, being unaware that in making his calculation Stewart had failed to charge him with the $17,000 payment of December 31st. But it is clear that no representative of the complainant authorized to bind it ever saw this statement, for, as already pointed out, the complainant's representative Florida who handled the entire matter, was unaware of the amount of the balance due the defendant, and when the defendant called him over the phone and demanded payment, he told his bookkeeper to pay whatever the auditor said was due without learning the amount even then.

The essence of an account stated is an agreement express or implied as to the amount due. There must

be an absolute acknowledgment of a certain sum due or a reference to something by which it can be definitely and certainly ascertained. If there is but an admission that something is due without specifying how much, there is no account stated. 1 C. J. S., Account Stated, Sections 29, 30, pp. 709, 711; 1 Am. Jur. 277.

So it is we say that there is no foundation in the evidence for the conclusion that the minds of the parties not on any basis of calculation, which, when made and utilized in a correct statement of the defendant's account, would show him to be due but $14,350.81. Nor, for that matter, is there any basis in the evidence for the conclusion that both parties agreed upon the correctness of the statement or account prepared by Stewart showing the balance to be $31,350.

Hence, there is no view of the case under which this court would be justified in awarding the complainant a money recovery of $17,000 on the basis of the complainant's interpretation of the jury verdict.

It remains to be determined whether, considering the evidence in the light of the pleadings, the order of reference made by the chancellor was justified. After setting out the substance of the contracts between the parties, the execution of the assignment by defendant to Price & Curd, and the payment to the latter by the complainant of $17,000 pursuant to the terms of said assignment, the bill continues:

"Approximately three hundred forty-three (343) homes having been completed by defendant, the parties, with their respective accountants, during the last days of December 1948 held meetings for the purpose of adjusting and stating an account between complainant, defendant and said Sales Agents, A. L. Stevens and James R. Garrett.

"About the time said assignment was satisfied by the payment of the aforesaid check of $17,000.00, complainant, defendant, and their respective accountants, agreed there was a balance of $31,350.81 due to defendant by complainant for the construction of said houses, but through oversight and mistake the payment of said sum of Seventeen Thousand Dollars ($17,000.00) to said assignees was not charged against defendant's account and the respective accountants of the parties were not furnished with the said debit charge of $17,000.00, and they made their report and stated an account in the sum of $31,350.81, as shown by a copy thereof filed as Exhibit '2' hereto.

"Complainant requested Continental Mortgage Company to pay to defendant for the account of complainant said balance of $31,350.81 through mistake, and in the belief that said payment of $17,000.00 to said defendant's assignees had been reported to said accountants and had been considered by them in stating said account as aforesaid. In compliance with said request of complainant, Continental Mortgage Company issued its check No. 719, payable to defendant, for the account of complainant, in the sum of $31,350.81, a photostat of which is attached hereto as Exhibit '3'.

"Complainant avers that through mistake the account of complainant with defendant was thereby overpaid by the said sum of $17,000.00. Demand for refund thereof was made by complainant upon defendant, and refused."

In addition to the prayer for process, the bill prayed that at the hearing the complainant have and recover of the defendant the sum of $17,000 with interest thereon and cost, and that a decree be entered accordingly, and

for "such other and further relief to which it may be entitled."

The account filed as Exhibit 2 to the bill purports to be the account of the defendant with 'the complainant. It shows the specific items of charges and credits and a credit balance of $31,350.81.

In the beginning the bill recites that, "This is an action for money had and received, paid by complainant to defendant under a mistake of fact". But the nature of an action is not to be determined by the name ascribed to it by the pleader. It is what the averments make it when tested by applicable principles of law, regardless of the name given to it.

So considering the bill, it will be observed that it specifically charges that there was an account stated between the parties, and that the overpayment was the result of the mistake in stating the account and not in the payment of the balance due as shown by the account stated. The averments were strictly appropriate to a bill to surcharge a specifically pleaded settled account by showing that an item of $17,000 for which the complainant was entitled to credit was by mistake omitted in stating the account. Gibson's Suits in Chancery, Secs. 952-955.

It is true that ordinarily a stated account is one rendered by the creditor to the debtor rather than by the debtor to the creditor as is the case here; and it is also true that the plea of stated or settled account is usually one by the debtor in a suit by the creditor for an accounting or for a money recovery, State ex rel. Stewart v. Follis, 140 Tenn. 513, 205 S. W. 444, and where pleaded it is a bar unless the complainant amend his pleading so as to seek to have the account either set aside or to surcharge or falsify it on a proper ground. But there is no

sound reason why the same principles should not be applied where the complainant anticipates the plea by the defendant and charges in the first place a stated or settled account, seeking to surcharge or falsify it on the ground of fraud or mistake, and prays for appropriate relief.

■ ■ We are in accord with the complainant's contention that ordinarily money paid by mistake may be recovered in a simple action for money had and received. All the authorities are to that effect. But we are cited to no authority and have found none which justifies the view that money paid by mistake in settlement of a stated account can be recovered without first opening the account or at least surcharging or falsifying it.

The principles are discussed by Mr. Gibson in his Suits in Chancery, at Sections 952-955. See also, State ex rel. Stewart v. Follis, 140 Tenn. 513, 205 S. W. 444; Raht v. Union Consol. Mining Co., 73 Tenn. 1; Pomeroy's Equity Jurisprudence Vol. 3, Sec. 871-E.

■ Accepting the averments of the bill as true, the account stated created a new contract between the parties whereby the complainant agreed to pay the defendant $31,350. If made, this contract superseded all prior contracts and obligations represented by the particular items constituting the account. The balance was a liquidated debt, as binding as if evidenced by a note. 1 Am. Jur. 272, 284; 1 C. J. S., Account Stated, Section 44, P. 726. It was conclusive as against the parties unless shown to be the result of fraud or mistake. 1 Am. Jur. 285; 1 C. J. S., Account Stated, Section 43, pp. 724, 725; State ex rel. Stewart v. Follis, supra; Henshaw v. Gunter, 169 Tenn. 305, 87 S. W. (2d) 561.

■ ■ Under these principles it seems clear that the complainant was entitled to no relief unless it were first given leave to surcharge the account pleaded. There

is no prayer that the complainant be allowed to do this. Whether upon a proper showing such relief could be granted under the prayer for general relief, we need not decide. Nor need we decide the effect of the failure of the complainant to offer in the bill to do equity by allowing the defendant to object to any items in the account. See, 1 C. J. S., Account Stated, Section 57-C2, P. 739. For, as we have already pointed out, the evidence does not justify the conclusion that there was an account stated and settled between the parties within the meaning of the applicable principles.

 ██ The minds of the parties never met, either with respect to the items of debit and credit in the account or the balance due, and it may be noted in this connection that the rule is that the report of a third person selected to ascertain the balance due on an account does not constitute an account stated between the parties unless and until they acquiesce therein. 1 C. J. S., Account Stated, Section 5 c, p. 697.

It should be said in this connection that all the evidence is to the effect that neither of the three auditors was authorized to bind any of the parties, and this seems to be conceded. See 1 Am. Jur., 278.

It follows that the rights of the parties were determinable by the terms of the original contract, and the order of reference made by the Chancellor was no doubt intended to have the groundwork laid for a decision on that basis.

In taking this action, the Chancellor was in effect trying the suit as one for an accounting to be made according to the terms of the original contract between the parties, no doubt having in mind that upon the coming in of the report on reference he would grant relief according to a correct statement of the account. In doing this, as the Chancellor noted, he was granting relief which the complainant

not only did not ask for but on the hearing expressly repudiated. The reason for this attitude on the part of complainant and for the insistence that this is a simple action for money had and received, and no more, is obvious. The complainant's auditor Stewart conceded that in calculating the profits of the second group of houses, the auditors did not follow the contract with respect to the items of cost or expense chargeable to the enterprise, and that had they done so and used the result in stating the defendant's account, the latter would not only not have been overpaid by the sum of $17,000 but would have lacked some $4,000 of getting all he was due after allowing the complainant credit for the $17,000 payment and such others as had been made.

 Strictly speaking the stating of the account in the manner ordered by the Chancellor was not, we think, within the purview of the bill. The power of a court of equity to grant relief under a general prayer where the equities demand it, is liberally regarded, but the Supreme Court has said that " 'the cardinal rule is, that the bill must not be so vague that the defendant may be surprised by a case that he could not be prepared to meet' "; and the " 'relief must be agreeable to the case made by the bill, and not different from it' "; "it must not be either antagonistic to or altogether different from, that specifically prayed for". Caldwell v. Huffstutter, 173 Tenn. 225, 116 S. W. (2d) 1017, 1019, and cases cited.

Chancellor Gibson notes that, "A bill that seeks to open and reform a stated or settled account, or to set aside such an account, or to surcharge and falsify any settlement made by executors, administrators, or guardians, is a very different bill from one for an accounting where the account is open." Gibson's Suits in Chancery, Sec. 954. As already pointed out, the averments of the

present bill make it one to surcharge a settled account which is expressly pleaded in the bill; whereas, the order of reference is one contemplated by a bill for an accounting where the account is open.

But the action of the Chancellor in ordering a reference was within the scope of the issues made by the answer and cross-bill filed by the defendant and the answer of the complainant to the cross-bill, and was fully justified by the evidence. The theory of the defendant's answer was that the payment of $31,350.81 was agreed by the parties to be in full and final settlement of all liability of the complainant to the defendant, notwithstanding that the latter was in fact due a larger sum, to-wit, $35,134.55 and upon other pertinent allegations the cross-bill prays that if said settlement .should be set aside or impeached in any manner that cross-complainant be given a judgment for the difference or such other amount as he may be entitled to upon a proper accounting to be had in this cause. There was also a prayer for general relief.

Hence we conclude that in the plight of the case as it reaches us, the action of the Chancellor was within the scope of the pleadings and was fully justified by the evidence. Therefore, it was authorized even though not within the purview of the complainant's bill. See, Gibson's Suits in Chancery, Sec. 726; Partee v. Goldberg, 101 Tenn. 664, 49 S. W. 758.

We have not found it necessary to pass on the defendant's contention that the order of reference was justified because if, upon a proper accounting made according to the terms of the contract, it should appear that the complainant was justly indebted to the defendant after allowing it credit for all payments made to him, including the $17,000 payment, to allow the complainant a recovery would be inequitable and hence fall within the exception

to the general rule that a payment induced by a mistake cannot be recovered if the payee in equity and good conscience is entitled to retain the money received. 40 Am. Jur. 845, Sec. 188; page 852, Sec. 201; page 854, Sec. 202. That question may or may not arise when the Chancellor comes to pass a decree on the clerk and master's report on the reference.

The defendant has assigned errors raising a number of other questions. We do not deem it necessary to deal with these in detail. So far as is necessary to consider them, they have all in effect been disposed of by what we have already said without specifically referring to them. We may add that the defendant is hardly in a position to complain of the Chancellor's action because it in effect does only what the defendant offered to do both prior to the trial and during its progress.

The result is that the decree of the Chancellor is affirmed and the cause remanded for further proceedings. The cost of the appeal will be paid by the complainant. The cost accruing in the Chancery court will be paid as adjudged by the Chancellor.

Baptist, and Swepston, JJ., concur.